UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| VICKI L. PINERO, individually and on behalf of all others similarly situated, | ) ) | Civil Action No. 08-03535 |
| | ) | Sec. R |
| Plaintiffs, | ) | JUDGE SARAH S. VANCE |
| | ) | |
| v. | ) | Mag. 3 |
| | ) | MAGISTRATE JUDGE DANIEL E. |
| JACKSON HEWITT TAX SERVICE INC.; JACKSON HEWITT INC.; and, CRESCENT CITY TAX SERVICE, INC. d/b/a JACKSON HEWITT TAX SERVICE, | ) ) ) ) ) | KNOWLES, III |
| | ) | |
| Defendants. | ) | |

**THIRD AMENDED CLASS ACTION COMPLAINT**

NOW INTO COURT, through undersigned counsel, comes plaintiff, Vicki L. Pinero ("Plaintiff"), who, on behalf of herself and all others similarly situated, files this Third Amended Class Action Complaint against defendants, Jackson Hewitt Tax Service Inc. ("JHTSI"); Jackson Hewitt Inc. ("JHI"); and, Crescent City Tax Service, Inc. d/b/a Jackson Hewitt Tax Service ("CCTSI") (jointly referred to as "Defendants").[1]

---

[1] Plaintiff is not re-filing the exhibits previously filed, although such exhibits are expressly incorporated herein.

## INTRODUCTION

1.      Defendants are part of the second largest tax preparation organization in the world.  JHTSI, the ultimate parent corporation, reported nearly $300 million in total revenue for 2007.  As part of their lucrative bussiness, Defendants are provided the most sensitive personal and financial information about their customers—the keys to the financial vault.  Such information includes, but is not limited to, social security numbers, dates of birth, driver's license numbers, names and social security numbers for dependents, and annual income.  Defendants' customers entrust Defendants with this highly confidential information with the expectation that the information will not be improperly disclosed or placed in the public domain and based upon Defendants' representations as to their security protocals.  This case partly relates to how Defendants violated that trust and made knowingly false representations as to their security protocals.

2.      Defendants represented to Plaintiff and the class members that protecting the privacy of their customers' personal and financial information is a "core value" and that they have state-of-the-art policies, practices, and procedures to prevent improper disclosures of such information and sensitive documents.  Further, at the time Plaintiff and the class members contracted with Defendants to obtain tax preparation services, Defendants represented that (a) they "maintain policies and procedures designed to restrict access to nonpublic personal information about you to those persons who need to know that information to fulfill your request for products or services" and that (b) "[t]hese policies and procedures include physical, electronic, and procedural safeguards

2

that comply with federal regulations to guard your information." These representations were contained in, *inter alia*, Defendants' "Privacy Policy" issued to Plaintiff and the class members. These representations were false ***when made***.

3.     Contrary to Defendants' representations, and in spite of numerous federal and state laws, regulations, and rules requiring that Defendants safeguard their customers' personal and financial information and documents, Defendants did *not* have in place ***at the time they made their confidentiality representations*** the promised policies and practices to maintain proper confidentiality and security of the highly confidential information and documents entrusted to them.

4.     This action seeks class-wide redress for Defendants' misrepresentations and flagrant disregard of the personal and financial welfare and privacy of their customers. Defendants' actions violate numerous federal and state laws, regulations, and rules. Plaintiff and the putative class seek monetary, declaratory, and injunction relief to remedy Defendants' unlawful practices.

## PARTIES

5.     Plaintiff is a Louisiana citizen, residing in Metairie, Louisiana.

6.     Upon information and belief, Defendants are authorized IRS e-filers.

7.     Upon information and belief, JHTSI is the second largest tax preparation company in the U.S. (behind H&R Block) with approximately 6,800 franchised and company-owned offices throughout the U.S. JHTSI represents that the company: specializes in electronic filing (IRS e-file); provides full service, individual federal and state

3

income tax preparation; and, facilitates related financial products.  JHTSI is a public company traded on the NYSE under the symbol "JTX."  In its 2007 Annual Report, JHTSI reported $293.2 million in total revenue for the fiscal year 2007.  *See* Exhibit A, JHTSI 2007 Annual Report.  Upon information and belief, JHTSI is a Delaware corporation with its principle place of business in Parsippany, New Jersey.

8.      Upon information and belief, JHI is a wholly owned subsidiary of JHTSI and is responsible for franchising the Jackson Hewitt Tax Service brand.  JHI is also the owner of Tax Services of America, Inc., a Delaware corporation, which operates the company-owned offices.  Upon information and belief, JHI is a Virginia corporation with its principle place of business in Parsippany, New Jersey.

9.      Upon information and belief, CCTSI is the franchise owner of approximately 37 Jackson Hewitt Tax Service locations in the greater New Orleans area, including the location at 6601 Veterans Blvd., Metairie, LA  70003, and 3130 Loyola Drive, #5, Kenner, LA  70065.  Upon information and belief, Max M. Hirsch, Anne Hirsch, and Barbara Hirsch Troncoso are the owners and operators of CCTSI.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action and Defendants pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1367 (supplemental jurisdiction). Further, this Court has jurisdiction over this action and Defendants pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between Plaintiff and at least 1 of the

Defendants and the matter in controversy exceeds the sum or value of $5 million, exclusive of interest and cost.

11.     Venue is proper in this Court per 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claims occurred in this judicial district.

## BACKGROUND

12.     The Social Security Administration ("SSA") reports "[i]dentity theft is one of the fastest growing crimes in America."  Exhibit B, SSA Pamphlet, at p. 1.  In an October 24, 2004 story, The New York Times reported that identity theft is a national "epidemic." *See* Exhibit C, 10/24/04 NYT Article.  The Consumer Sentinel database, maintained by the Federal Trade Commission ("FTC"), indicates that the highest percentage of complaints received by the FTC since 2001 has concerned identity theft.

13.     "Identity theft is the intentional use or possession or transfer or attempted use with fraudulent intent by any person of any personal identifying information of another person to obtain, possess, or transfer, whether contemporaneously or not, credit, money, goods, services, or any thing else of value without the authorization or consent of the other person."  La. Rev. Stat. § 14:67.16(B).  Identity theft usually leads to "identity fraud."  The Economic Crime Institute ("ECI") notes:

> Identity fraud, which encompasses identity theft, is the use of false identifiers, false or fraudulent documents, or a stolen identity in the commission of a crime.  It often emanates from a breeder document created from fictitious or stolen identifiers.  The breeder document, such as a driver's license or birth certificate, is used to spawn other documents, resulting in the creation of a credible identity which allows a criminal or terrorist access to credit cards, employment, bank accounts, secure facilities, computer systems, and the like.  Once a criminal or terrorist has

5

an established identity, he can use it to facilitate a variety of economic crimes, drug trafficking, terrorism, and other crimes.

Exhibit D, 10/28/03 ECI Report, at p. 4. In its 2006 report, the ECI reported that identity fraud continues to be a growing problem. *See* Exhibit E, 06/06 ECI Report, at pp. 3-5.

14. In November 2007, the FTC released its 2006 Identity Theft Survey Report. *See* Exhibit F, 11/07 FTC Survey Report. The survey estimated that 8.3 million American consumers, or 3.7 % of the adult population, were the victims of identity theft in 2005. *Id.* at pp. 3-4. The report noted that, in most cases, the victims were not legally responsible for the cost of the fraudulent transaction because of various federal and state laws limiting the liability of consumers for fraudulent transactions by identity thieves. *Id.* at p. 6, fn. 5. Notwithstanding these consumer laws, however, the report found that many victims still incurred some cost associated with the theft of their identity. *Id.* at pp. 5-7. The report found many victims incurred out-of-pocket expenses of $40 to $5,000. *Id.* The report also found many victims spent hundreds, and sometimes thousands, of hours in attempting to resolve the problems related to the identity theft. *Id.* The report determined that 56% of the victims did not know how their personal information was stolen, and 5% of the victims learned that their personal information was obtained or stolen from a company that had the information. *Id.* at pp. 30-31. The report noted that 37% of the victims experienced problems beyond the out-of-pocket expenses and the time they spent resolving the problem. *Id.* at pp. 41-42. These problems included: being harassed by debt collectors; being denied new credit; being unable to use existing credit cards; being unable to get loans; having their

6

utilities cut off; being subject to a criminal investigation or civil suit; being arrested; and, having difficulties obtaining or accessing bank accounts. *Id.* The report concluded that many victims "said they were most affected by the emotional impact of the ID theft including the effects of stress on their lives and their health or the emotional toll resulting from the realization that they were vulnerable or had been betrayed." *Id.* at p. 53.

15.    As reported by The New York Times in a December 21, 2003 article, entitled *Dumpster-Diving for Your Identity*, "[i]t's a popular perception that most identity theft happens on the Internet, but . . . low-tech methods of getting people's personal information are far more effective." Exhibit G, 12/21/03 Identity Theft Article. The Federal Bureau of Investigation warns:

> An individual or business that fails to dispose properly of personal identification information, by shredding or mutilating, could find themselves susceptible to a "dumpster diver"—an individual who retrieves discarded material looking for anything of value. Dumpster divers obtain account numbers, addresses, and dates of birth from financial, medical, and personal records—all of which they can use to assume an identity.

Exhibit H, FBI 08/00 Bulletin, at p. 9.

16.    With this backdrop, and due to the increasing cost associated with identity theft and fraud, President George W. Bush issued Executive Order 13402 in 2006, establishing the President's Task Force on Identity Theft, which is charged with developing a comprehensive national strategy to combat identity theft. The President directed the task force to make recommendations on ways to improve the effectiveness and efficiency of the

federal government's efforts in the areas of identity theft awareness, prevention, detection, and prosecution.

17.    In 2007, the President's task force issued a report.  *See* Exhibit I, Task Force Report Vol. I.  Not surprisingly, the task force noted that one of the "tools of the trade" for identity thieves is "dumpster diving."  *Id.* at pp. 13-15.  Reports issued by other independent sources, including the Center for Identity Management and Information Protection, have likewise confirmed that "dumpster diving" is a common "tool" used by identity thieves.  *See* Exhibit J, CIMIP Report; *see also* Exhibit B, SSA Pamphlet, at p. 3 ("Identity thieves get your personal information by . . . [r]ummaging through your trash, the trash of businesses and public trash dumps for personal data[.]").

18.    As noted in the task force report, there is a voluminous amount of written guidance readily available for businesses on how to safeguard the personal information of consumers.  *See* Exhibit K, Task Force Report Vol. II, at pp. 19-26.  Much of this written guidance has been available for several years.  Much of this guidance is "common sense."

19.    For example, the FTC has issued a guide for businesses, entitled *Protecting Personal Information*.  *See* Exhibit L, FTC Guide for Businesses.  In its guide, the FTC notes that 1 of the 5 "key principles" to a "sound data security plan" is proper disposal of documents containing confidential, financial or personal information.  *Id.* at p. 3.  The FTC notes that businesses handling such documents *must* ensure the documents are "unreadable" before throwing them away.  *Id.* at pp. 20-21.  Per the FTC, such documents must be

burned, shredded, or pulverized to make sure that identity thieves cannot steal the documents from the trash.  *Id.*

20.     The FTC has also issued guidance to businesses on what they should do when an "information compromise" has occurred creating the possibility for identity theft.  *See* Exhibit M, FTC Info. Comp. Guide.

21.     In a press release relating to a settlement of an FTC lawsuit against a mortgage company that left loan documents with consumers' sensitive financial and personal information in and around an unsecured dumpster, FTC Chairman Deborah Platt Majoras stated, "Every business, whether large or small, must take reasonable and appropriate measures to protect sensitive consumer information, from acquisition to disposal."  Exhibit N, FTC 12/18/07 Press Release.

**<u>FACTS</u>**

22.     On or about January 31, 2006, Plaintiff visited the Jackson Hewitt office located at 6601 Veterans Blvd., Metairie, LA  70003 to have her 2005 federal and state tax returns prepared and e-filed.  Upon information and belief, this Jackson Hewitt office is owned and managed by CCTSI.

23.     During her visit, Plaintiff met with Kimberly Vazquez and provided highly confidential, private and financial information about herself and her family, including, but not limited to, the following:  social security number; date of birth; driver's license number; daughter's name, social security number, and date of birth; home address; home

phone number; work phone number; annual income; employer name and address; and, occupation.  Plaintiff also provided her W-2s.

24.     During her visit, Plaintiff was given a copy of Jackson Hewitt's "Privacy Policy."  *See* Exhibit O, JH Privacy Policy.  In pertinent part, the "Privacy Policy" states:

> At Jackson Hewitt®, protecting your privacy is a core value of our relationship with our customers.  Please read this policy carefully.  It gives you important information about how we* handle your personally identifiable information, which is nonpublic information about you that we obtain, use, or disclose to provide you with our services.
>
> . . . .
>
> **Our Approach to Data Security**
> We maintain policies and procedures designed to restrict access to nonpublic personal information about you to those persons who need to know that information to fulfill your request for products or services. These policies and procedures include physical, electronic, and procedural safeguards that comply with federal regulations to guard your information.

25.     The "Privacy Policy" further states:

> This privacy policy is being provided by Jackson Hewitt Tax Service Inc., and its subsidiaries and affiliates, and/or by our independently owned and operated third-party franchisees (collectively referred to as "Jackson Hewitt," "we," "us," or "our"), and applies to our current and former customers.

26.     In shortest summary, Plaintiff and the class members were drawn to Jackson Hewitt based upon brand recognition.  When they entered the door, they were promised *by all of the Defendants* that certain policies and procedures were in-place to protect the personal and financial information and documents they would be providing to Defendants. Defendants knew their confidentiality representations were false when made.  Defendants

10

knew at the time the representations were made to Plaintiff and the class members that they did *not* have in-place the represented policies and procedures that complied with applicable laws and regulations.  Defendants' confidentiality representations, that Defendants knew were false at the time they were made, were made to fraudulently induce Plaintiff and the class members to obtain tax preparation services through Jackson Hewitt.

27.    As noted, Defendants represented that (a) they "maintain policies and procedures designed to restrict access to nonpublic personal information about you to those persons who need to know that information to fulfill your request for products or services" and that (b) "[t]hese policies and procedures include physical, electronic, and procedural safeguards that comply with federal regulations to guard your information." *Id.*

28.    The contract to provide tax services is between the customer and *all of the Defendants*.  Like the contract to provide services, the confidentiality representations at issue here were from *all of the Defendants*.  At the very least, by the language contained in the "Privacy Policy" presented to Plaintiff and the class members, all of the Defendants participated in and facilitated the misrepresentation.  Contrary to Defendants' confidentiality representations, ***at the time such representations were made***, Defendants ***did not***:

A.    Properly monitor their employees/agents to ensure necessary confidentiality and/or security protocols are followed.

B.    Properly discipline or reprimand for violations of confidentiality and/or security protocols.  *See* Exhibit R, *in globo*, Police Reports.

C.     Properly store confidential customer information and documents in safe or secured locales.

D.     Properly monitor by alarm or otherwise their buildings, warehouses, and offices.

E.     Properly limit ingress and egress into company buildings, warehouses, and offices.

F.     Properly store confidential customer documents in locked or secured file cabinets or other secure locations.

G.     Properly maintain a chain-of-custody of confidential customer documents.

H.     Properly prohibit employees/agents from taking confidential customer documents home, or to other non-secure private and public places.

I.     Properly maintain a log of where confidential customer documents are located or maintained; and

J.     Properly dispose of confidential customer documents.

29.     At the time Plaintiff was deciding to hire Defendants to complete her 2005 tax returns, Defendants told Plaintiff, as Defendants always tell their customers, that her confidential, private and financial information and documents would not be placed in the public domain for access by anyone.

30.     The maintenance of strict confidentiality regarding Plaintiff's private and financial information was a condition precedent to the hiring of Defendants to complete her tax returns.

31.     Contrary to their representations, Defendants threw Plaintiff's original and signed 2005 federal and state tax returns and other confidential documents in a public dumpster located in Gretna, Louisiana.  The tax returns were in original, readable form and were *not* burned, shredded, or pulverized, as required by federal and state law and regulations and as promised.

32.     The documents were found by Wilhemina Walker.

33.     In addition to Plaintiff's documents, Ms. Walker also found in the same dumpster the tax returns of over 100 other individuals, with some tax returns dating back to 2003, and numerous other Jackson Hewitt materials, including banners, brochures, office supplies, and employee instruction books.

34.     After discovering the documents, Ms. Walker contacted WDSU, Channel 6, which contacted Plaintiff and others to advise of the discovery.

35.     Richard Angelico, of WDSU 6 on Your Side, returned to Plaintiff her 2005 tax returns found in the Gretna dumpster.  In May 2008, a report aired on Channel 6 regarding the discovery of the confidential tax returns.

36.     In response to the Channel 6 report, CCTSI issued the attached public statement, claiming to be the "victim of a theft."  Exhibit P, CCTSI Public Statement. Although claiming to be the "victim," CCTSI filed a police report alleging that Mary L. Hall, *CCTSI's Director of Compliance and in a "position of authority with access,"* threw the documents in the dumpster.  Exhibit S, 05/06/08 Police Report.  Ms. Hall was known around the office as the *"File Cabinet"* because, when documents were missing, commonly

the documents were in Ms. Hall's car.  It was a common practice for Ms. Hall and others to take documents home and out of the office to non-secure places, without logging where the documents were being taken, all in violation of federal and state laws and regulations regarding the security of tax documents.

37.     As the employer/principal of Ms. Hall, Defendants are liable for Ms. Hall's wrongful and intentional actions, including her invasion of privacy, conducted in the course and scope of her employment and agency.

38.     Jackson Hewitt franchise owners, such as CCTSI, are required to sign a franchise agreement (the "JH Franchise Agreement") with JHI.  *See* Exhibit Q, JH Franchise Agreement.  In pertinent part, the JH Franchise Agreement provides:

> 12.3.1  You agree that the following are *our trade secrets and confidential and proprietary information*:  the identities of the customers served by the Franchised Business, (including their names, addresses, phone numbers, social security numbers and financial and tax information), tax return copies (whether on disk, in a database, in any other computer data storage media, or on paper), . . . W-2s, 1099s, 8453s, . . . Financial Products applications and other Financial Products related documents, and any other documents related to services performed on behalf of customers . . . .  You must maintain, both during and after the term of this Agreement, absolute confidentiality of such items.  You may give this information to your employees only to the extent necessary for the operation of the Franchised Business in accordance with this Agreement.  You may not use this information in any other business or in any other way not authorized by us in advance in writing.
>
> 12.3.2  . . . .  You promise that you will not at any time, without our prior written approval, disclose, use, permit the use of, copy, duplicate, record, transfer, transmit or otherwise reproduce *our* . . . *confidential or proprietary information*, in any form or by any means, in whole or in part, or otherwise make it available to any unauthorized person, entity or source.

*Id.* at ¶ 12.3, pp. 12-13 (emphasis added).

39.     As a result of Defendants' unlawful actions or inactions, Plaintiff has suffered, and continues to suffer, damages, including:  fear; panic; anxiety; sleeplessness; nightmares; embarrassment; hassle; anger; loss time; loss of consortium; and other emotional and physical distress, all in an amount to be determined at trial.  In addition to all general damages, Plaintiff seeks and is entitled to special damages related to:  credit monitoring; credit insurance; reimbursement for all out-of-pocket expenses related to notifying creditors of the improper disclosure; reimbursement for all out-of-pocket expenses related to identity theft; and other special damages.  Further, Plaintiff seeks and is entitled to reimbursement of all fees paid to Defendants.

## APPLICABLE LAW

40.     There are numerous federal and state laws, regulations, and rules protecting the private and confidential information of consumers, including the Gramm-Leach Bliley Act ("GLBA"), 15 U.S.C. § 6801, *et seq.*; the FTC's Privacy Rule, 16 C.F.R. § 313.1, *et seq.*; the FTC's Safeguards Rule, 16 C.F.R. § 314.1, *et seq.*; 26 U.S.C. § 6103 (confidentiality of tax returns); 26 U.S.C. § 6713 (disclosure or use of information by tax return preparers); 26 U.S.C. § 7216 (same); the Louisiana Database Security Breach Notification Law ("LA Security Breach Statute"), La. Rev. Stat. § 51:3071, *et seq.*; and, the Louisiana Unfair Trade Practices and Consumer Protection Law ("LA Unfair Trade Practices Statute"), La. Rev. Stat. § 51:1401, *et seq.*

41.     The GLBA states "[i]t is the policy of the Congress that each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information."  15 U.S.C. § 6801(a).

42.     The FTC's Privacy Rule states that businesses "may not, directly or through any affiliate, disclose any nonpublic personal information about a consumer to a nonaffiliated third party," unless the disclosure is permitted per one of the listed exceptions. 16 C.F.R. § 313.10(a)(1).  None of the exceptions apply to the disclosures that occurred here.

43.     The FTC's Safeguards Rule states that businesses must "develop, implement, and maintain a comprehensive information security program that is written in one or more readily accessible parts and contains administrative, technical, and physical safeguards that are . . . reasonably designed to . . . (1) [i]nsure the security and confidentiality of customer information; (2) [p]rotect against any anticipated threats or hazards to the security or integrity of such information; and (3) [p]rotect against unauthorized access to or use of such information that could result in substantial harm or inconvenience to any customer."  16 C.F.R. § 314.3.

44.     Section 6713 provides:

(a) Imposition of penalty.—If any person who is engaged in the business of preparing, or providing services in connection with the preparation of, returns of tax imposed by chapter 1, or any person who for compensation prepares any such return for any other person, and who—

(1) discloses any information furnished to him for, or in connection with, the preparation of any such return, or

(2) uses any such information for any purpose other than to prepare, or assist in preparing, any such return,

shall pay a penalty of $250 for each such disclosure or use, but the total amount imposed under this subsection on such a person for any calendar year shall not exceed $10,000.

26 U.S.C. § 6713(a).

45.     Section 7216 provides:

(a) General rule.—Any person who is engaged in the business of preparing, or providing services in connection with the preparation of, returns of the tax imposed by chapter 1, or any person who for compensation prepares any such return for any other person, and who knowingly or recklessly—

(1) discloses any information furnished to him for, or in connection with, the preparation of any such return, or

(2) uses any such information for any purpose other than to prepare, or assist in preparing, any such return,

shall be guilty of a misdemeanor, and, upon conviction thereof, shall be fined not more than $1,000, or imprisoned not more than 1 year, or both, together with the costs of prosecution.

26 U.S.C. § 7216(a).

## CLASS DEFINITION

46.     Pursuant to Fed. R. Civ. P. 23, Plaintiff brings this action on behalf of

persons similarly situated.  The class consists of all Louisiana residents who received tax

preparation services through Defendants and whose tax return information, tax return, or

other personal or financial information was disclosed, without consent, or mishandled during the 10-year period prior to the filing of the complaint.

## CLASS ISSUES

47.    There are questions of law and fact common to each class member, which predominate over issues peculiar to the class members.  The principal common questions include:

A.    Whether Defendants violated 26 U.S.C. § 6103;

B.    Whether Defendants' improper tax return disclosures were willful, or the result of gross negligence, entitling the class members to punitive damages;

C.    Whether Defendants breached their contracts with the class members by disclosing the class members' confidential, financial and private information;

D.    Whether Defendants fraudulently induced the class members;

E.    Whether Defendants' contract breaches were in bad faith per La. Civ. Code art. 1997, entitling the class members to all foreseeable and unforeseeable damages related to the contract breaches;

F.    Whether Defendants' actions or inactions constitute negligence *per se*;

G.    Whether Defendants violated the LA Security Breach Statute;

H.    Whether the class members are entitled to damages under the LA Security Breach Statute;

18

I.      Whether the class members are entitled to declaratory and/or injunctive relief;

48.     Plaintiff's claims are typical of the claims of the class members.  All are based on the same factual and legal basis.

49.     Plaintiff will fairly and adequately protect the interest of all class members in the prosecution of this action and in the administration of all matters related to the claims asserted.  She is similarly situated with, and has suffered similar injuries as, the members of the class she seeks to represent.  Plaintiff has retained counsel experienced in handling class action suits involving unfair business practices and consumer law.  Neither Plaintiff, nor her counsel, has any antagonistic interest that would inhibit vigorously pursuing this action.

50.     A class action is superior to any other available methods for the fair and efficient adjudication of this controversy, particularly considering:

A.      The losses suffered by the class members are such that prosecution of individual actions is impractical or economically infeasible;

B.      The form of proof required is such that prosecution of individual actions is impractical or economically infeasible;

C.      In the absence of the class action device, Plaintiff and the class members will be left without a remedy for the wrongful acts alleged, and Defendants will be unjustly enriched;

D.      The prosecution of separate lawsuits by individual class members would create the risk of inconsistent adjudications with respect to individual class members, which would establish incompatible standards of conduct for the Defendants, making concentration of the litigation concerning this matter in this Court desirable;

E.      The claims of the representative Plaintiff are typical of the claims of the class; and

F.      No unusual difficulties are likely to be encountered in the management of this action as a class action.

51.     The class is so numerous as to make it impractical to join all members of the class as plaintiffs.  Upon information and belief, there are more than 100 persons in the class.

## COUNT 1:  UNAUTHORIZED DISCLOSURE OF TAX RETURNS

52.     On behalf of the putative class, Plaintiff hereby incorporates, as if written *in extenso*, ¶¶ 1 – 51 in support of this count.

53.     Per the Court's January 7, 2009 order, Count 1 was dismissed.  *See* Docket No. 54.  Plaintiff reserves any and all rights she has or may have to appeal the dismissal of her claims under this Count.

## COUNT 2:  FRAUD

54.     On behalf of the putative class, Plaintiff hereby incorporates, as if written *in extenso*, ¶¶ 1 – 53 in support of this count.

55.    As described above, Defendants induced Plaintiff and the class members to enter into a contract for tax preparation services based upon false representations made at the time of entering the contract regarding the companies' privacy policy and practices and policies regarding privacy and maintaining the confidentiality of sensitive information and documents.  Defendants knew their confidentiality representations were false when made.

56.    "A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished."  La. Civ. Code art. 1906.  "Consent [to a contract] may be vitiated by error, *fraud*, or duress."  La. Civ. Code art. 1948 (emphasis added). "Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other.  Fraud may also result from silence or inaction."  La. Civ. Code art. 1953.

57.    "The party against whom rescission is granted because of fraud is liable for damages and attorney fees."  La. Civ. Code art. 1958.

58.    As a result of Defendants' fraudulent inducement, the class members are entitled to return of all monies paid to Defendants, plus damages to be proven at trial and attorneys' fees.

## COUNT 3:  BREACH OF CONTRACT

59.    On behalf of the putative class, Plaintiff hereby incorporates, as if written *in extenso*, ¶¶ 1 – 58 in support of this count.

60.     Per the Court's January 7, 2009 order, Count 3 was dismissed.  *See* Docket No. 54.  Plaintiff reserves any and all rights she has or may have to appeal the dismissal of her claims under this Count.

## COUNT 4:  NEGLIGENCE

61.     On behalf of the putative class, Plaintiff hereby incorporates, as if written *in extenso*, ¶¶ 1 – 60 in support of this count.

62.     Per the Court's January 7, 2009 order, Count 4 was dismissed.  *See* Docket No. 54.  Plaintiff reserves any and all rights she has or may have to appeal the dismissal of her claims under this Count.

## COUNT 5:  INVASION OF PRIVACY

63.     On behalf of the putative class, Plaintiff hereby incorporates, as if written *in extenso*, ¶¶ 1 – 62 in support of this count.

64.     In Louisiana, the courts recognize four categories of the invasion of privacy tort:  (1) misappropriation of a person's name or likeness; (2) intrusion upon physical solitude or seclusion; (3) placing a person in a false light before the public; and (4) unreasonable public disclosure of private facts.

65.     Defendants, through their employee(s)/agent(s), invaded the privacy of Plaintiff.  Defendants are liable for the intentional actions of their employee(s)/agent(s), which caused an unreasonable public disclosure of private facts.  Further, such conduct was unreasonable and seriously interfered with Plaintiff and the class members' privacy interest.  Defendants publicized information concerning Plaintiff and the class members'

private life by disposing of their confidential tax returns and other related documents in a public dumpster, with free access to any citizen.  Such improper disclosure is highly offensive to the reasonable person and the improperly disclosed documents are not of legitimate public concern.

66.     As a result of Defendants' unlawful and tortious conduct, the class members have suffered, and will continue to suffer, damages in an amount to be determined at trial.

### COUNT 6:  VIOLATION OF LA SECURITY BREACH STATUTE

67.     On behalf of the putative class, Plaintiff hereby incorporates, as if written *in extenso*, ¶¶ 1 – 66 in support of this count.

68.     Per the Court's January 7, 2009 order, Count 6 was dismissed.  *See* Docket No. 54.  Plaintiff reserves any and all rights she has or may have to appeal the dismissal of her claims under this Count.

### COUNT 7:  DECLARATORY JUDGMENT

69.     On behalf of the putative class, Plaintiff hereby incorporates, as if written *in extenso*, ¶¶ 1 – 68 in support of this count.

70.     Pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201, the class members seek and are entitled to a declaratory judgment that Defendants violated federal and state law due to their improper disposal of the class members' tax returns.

### COUNT 8:  INJUNCTION

71.     On behalf of the putative class, Plaintiff hereby incorporates, as if written *in extenso*, ¶¶ 1 – 70 in support of this count.

23

72.     Pursuant to Fed. R. Civ. P. 65, the class members seek and are entitled to an injunction, ordering Defendants to:  (a)  cease making unauthorized disclosures of the class members' tax returns and confidential, financial and private information, and to comply with all federal and state laws, regulations, and rules regarding the proper maintenance and disposal of such documents; and (b) cease fraudulently inducing potential customers by falsely promising that they maintain records in compliance with all federal and state laws and regulations.

### COUNT 9:  VIOLATION OF LA UNFAIR TRADE PRACTICES STATUTE
### (Brought by Plaintiff Individually)

73.     On behalf of herself only, Plaintiff hereby incorporates, as if written *in extenso*, ¶¶ 1 – 72 in support of this count.

74.     La. Rev. Stat. § 51:1405 provides "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

75.     In an attempt to convince Plaintiff to use the services of Jackson Hewitt, Defendants knowingly made false representations to Plaintiff regarding their confidentiality and security protocols.  Also, through their employee(s)/agent(s), Defendants invaded Plaintiff's privacy by improperly disclosing her highly confidential financial and private information and documents.

24

76. Defendants' unfair and/or deceptive actions offend established public policy and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to Plaintiff.

77. Pursuant to La. Rev. Stat. § 51:1409, Plaintiff has a private right of action against Defendants for the damages she has sustained due to Defendants' unfair and/or deceptive trade practices.

## <u>DEMAND FOR TRIAL BY JURY</u>

78. On behalf of herself and the putative class, Plaintiff demands a trial by jury as to all issues.

WHEREFORE, the premises considered, Plaintiff, on behalf of herself and all others similarly situated, respectfully requests that Defendants appear and respond as appropriate to this Third Amended Class Action Complaint, and that judgment be rendered against Defendants, awarding Plaintiff and the class members all damages to which they are entitled, including compensatory, exemplary, special, and punitive damages; all costs; interest from the date of judicial demand; and, attorneys' fees.

Respectfully Submitted,

/s/ Bryan C. Shartle
David Israel (LSBA No. 7174) (T.A.)
Bryan C. Shartle (LSBA No. 27640)
Justin H. Homes (LSBA No. 24460)
SESSIONS, FISHMAN, NATHAN & ISRAEL, L.L.P.
3850 N. Causeway Blvd.
Lakeway II, Suite 200
Metairie, Louisiana  70002
Telephone:  (504) 828-3700
Facsimile:  (504) 828-3737

Attorneys for Plaintiff,
Vicki L. Pinero

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the above and foregoing has been forwarded to all counsel of record ✓ by ECF; __ by email; __ by hand; __ by fax; __ by FedEx; __ by placing a copy of same in the U.S. Mail, postage prepaid this 24th day of April 2009.

/s/ Bryan C. Shartle
Bryan C. Shartle

N:\1-DI-Non-Collector-Misconduct\Pinero, Vicki-Class Action\Pleadings\LA Lawsuit\Final Draft Third Amended Complaint.04.24.09.doc