UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| VICKI L. PINERO, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> JACKSON HEWITT TAX SERVICE INC.; JACKSON HEWITT INC.; and, CRESCENT CITY TAX SERVICE, INC. d/b/a JACKSON HEWITT TAX SERVICE, <br><br> Defendants. | Civil Action No. 08-03535 <br><br> Sec. R <br> JUDGE SARAH S. VANCE <br><br> Mag. 3 <br> MAGISTRATE JUDGE DANIEL E. KNOWLES, III |

**MEMORANDUM IN OPPOSITION TO MOTIONS TO DISMISS**
**THIRD AMENDED CLASS ACTION COMPLAINT**

Defendants are *not* searching for the truth or justice. Instead, they are attempting to obfuscate through personal attacks, misrepresentations, and mischaracterizations.

Plaintiff, Vicki L. Pinero, submits this memorandum in opposition to the motions to dismiss filed by defendants, Jackson Hewitt Tax Service Inc. ("JHTSI"); Jackson Hewitt Inc. ("JHI"); and, Crescent City Tax Service, Inc. d/b/a Jackson Hewitt Tax Service ("CCTSI") (collectively referred to as "Defendants") [Docket Nos. 123 & 127].

1

# I. INTRODUCTION

The Court should deny Defendants' motions to dismiss for at least 4 reasons. *__First__*, plaintiff has *not* improperly amended her complaint. As ordered by the Court, plaintiff amended her complaint to include additional facts to support her fraud claim. Plaintiff has neither added any new claims, nor changed the theory of any of her existing claims.

*__Second__*, plaintiff has complied with this Court's order and Fed. R. Civ. P. 9(b) by pleading her fraud claim with specificity.

*__Third__*, plaintiff has stated an invasion of privacy claim. Further, contrary to JHTSI and JHI's improperly asserted liability arguments, JHTSI and JHI are liable for the unlawful actions of CCTSI.

*__Fourth__*, plaintiff has stated an unfair trade practices claim. Defendants are ignoring the allegations.

# II. LAW AND ARGUMENT

## *A. Plaintiff Has Not Improperly Amended Her Complaint*

Although over half of Defendants' brief is spent accusing plaintiff and undersigned counsel of improperly amending the complaint, Defendants do *not* explain anywhere in their brief how plaintiff allegedly changed the nature of any of her claims. *See* Docket No. 123-2. Defendants' omission is telling.

A comparison of plaintiff's Second Amended Class Action Complaint with plaintiff's Third Amended Class Action Complaint resolves the issue. *See* Docket Nos. 57 and 119. The allegations under the various "counts" of both complaints are virtually

identical. *Id.* Per her Third Amended Class Action Complaint, plaintiff simply added new "facts" under the "facts" section. *Id.* Naturally, the newly added facts support all of plaintiff's claims, not just her fraud claim. This is what Defendants are really worried about.

In both versions of plaintiff's complaint, plaintiff incorporated *all foregoing allegations*. As a point of reference and clarification with respect to the newly added *facts*, plaintiff added the words "employee(s)/agent(s)" to her invasion of privacy claim, along with a statement that Defendants are liable for the invasion of privacy (a fact previously incorporated into the count, and now expressly stated in the count). *See* Docket No. 119, at ¶ 65. Similarly, and again as a point of reference and clarification, the words "employee(s)/agent(s)" were also added to plaintiff's unfair trade practices claim, along with a statement that Defendants invaded plaintiff's privacy (again a fact previously incorporated into the count, and now expressly stated in the count). *Id.* at ¶ 75. None of these additional words transform the nature of any of plaintiff's claims and were only added as points of reference and clarification. Considering this fact, Defendants' argument is without merit. *See Clark v. America's Favorite Chicken Co.*, 896 F.Supp. 611, 615 (E.D. La. 1995) ("[T]hese are not necessarily 'new' claims, and defendants are not prejudiced in that the underlying allegations are well-known to all parties.").

Plaintiff has no idea what Defendants are talking about with respect to plaintiff's claim under 26 U.S.C. § 6103. *See* Docket No. 123-2, at p. 1. Contrary to Defendants' argument, plaintiff has *not* attempted to amend the claim. Indeed, plaintiff states in her

amended complaint, "[p]er the Court's January 7, 2009 order, Count 1 was dismissed. Plaintiff reserves any and all rights she has or may have to appeal the dismissal of her claims under this Count."  Docket No. 119, at ¶ 53 (citation omitted).

With respect to Defendants' contention that plaintiff has made "back-door" attempts to amend, plaintiff simply refers the Court to the docket.  Plaintiff has never attempted to "sneak in" any claims or arguments.  Instead, at all times, plaintiff and undersigned counsel have followed this Court's instructions and attempted to address the Court's concerns.  *See*, *e.g.*, Docket No. 110.

## B. Plaintiff Has Plead Her Fraud Claim with Specificity

Defendants argue plaintiff has not plead her fraud claim with specificity.  *See* Docket No. 123-2, at pp. 7-10.  Defendants are wrong.

"Rule 9(b) requires that a plaintiff set forth the 'who, what, when, where, and how' of the alleged fraud."  *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997).  Plaintiff has set forth these requirements.

### 1. Who Made the Fraudulent Representations?  JHTSI, JHI, and CCTSI

The Court has already ruled "plaintiff has sufficiently alleged the 'who, what, when, and where' elements necessary to support a claim of fraud."  Docket No. 54, at pp. 18-19. This continues to be true.

The fraudulent representations at issue were made by JHTSI, JHI, and CCTSI. Plaintiff alleges this fact throughout her amended complaint, and specifically states "the confidentiality representations at issue here were from *all of the Defendants*."  Docket No. 119, at ¶ 28 (emphasis in original); *see also* ¶¶ 1 ("Defendants . . . made knowingly

4

false representations as to their security protocols.") & 24-28. Defendants' "representations were contained in, *inter alia*, Defendants' 'Privacy Policy' issued to Plaintiff and the class members. These representations were false **<u>when made</u>**." *Id.* at ¶ 2 (emphasis in original). Defendants' "Privacy Policy" was given to plaintiff by Kimberly Vazquez during plaintiff's January 31, 2006 meeting with Ms. Vazquez. *Id.* at ¶¶ 22-24.

      As alleged, Defendants' "Privacy Policy" states:

> This privacy policy is being provided by Jackson Hewitt Tax Service Inc., and its subsidiaries and affiliates, and/or by our independently owned and operated third-party franchisees (collectively referred to as "Jackson Hewitt," "we," "us," or "our"), and applies to our current and former customers.

Docket No. 119, at ¶ 25. During the April 1, 2009 hearing, undersigned counsel explained that the "Privacy Policy" is from *all of the Defendants* and thus the misrepresentations in the "Privacy Policy" are from *all of the Defendants*:

> THE COURT: . . . . The other thing is: What is it that you're saying about these representations as between the franchisee and the franchisor?
>
> MR. SHARTLE: Well, it's very clear. You look at their privacy policy. It is a representation from all of them, not only the local franchisee. They define in their privacy policy the term *we*, which includes all of the defendants. Regardless of whether or not the franchisor is actually physically in the local office, they represent to consumers who come into Jackson Hewitt because of the brand name that they are going to protect that information, that they have policies and procedures in –

Docket No. 123-5, Exhibit C, at 11:5-11:16. Plaintiff has alleged the "who" element.

      Defendants continue to argue plaintiff has violated the so called "group pleading rule" by using the word "defendants" when pleading her fraud claim. *See* Docket No. 123-2, at p. 8. Defendants contend that, even if the statements are from all of the

5

defendants—as they are in this case—you cannot allege such without violating the so called "group pleading rule." Defendants' argument defies logic and the truth.

Further, even if the Court were to assume that the "group pleading rule" applies to plaintiff's fraud claim,[1] the *exception* to the rule applies. As the Fifth Circuit has ruled, a plaintiff may "group plead" when the complaint explains the connection between each defendant and the fraudulent statement. *See*, *e.g.*, *Southland Securities*, 365 F.3d at 365 ("[W]e do not construe allegations contained in the Complaint against the 'defendants' as a group as properly imputable to any particular individual defendant *unless the connection between the individual defendant and the allegedly fraudulent statement is specifically pleaded*.") (emphasis added). Plaintiff has properly alleged the connection between each defendant and the fraudulent statements. As noted, Defendants acknowledge in their "Privacy Statement" that the statements are *from all of them*.

### *2. What Are the Fraudulent Representations? Defendants Falsely Represented: (a) They "Maintain Policies and Procedures Designed to Restrict Access to Nonpublic Personal Information About You to Those Persons Who Need to Know That Information to Fulfill Your Request for Products or Services" and That (b) "[T]hese Policies and Procedures Include Physical, Electronic, and Procedural Safeguards That Comply With Federal Regulations to Guard Your Information"*

Plaintiff has clearly alleged "what" are the false statements. Plaintiff alleges:

---

[1] The "group pleading" doctrine appears relevant to only securities litigation. The Fifth Circuit has explained that the "doctrine allows plaintiffs to rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company." *Southland Securities Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 363 (5th Cir. 2004) (internal quotation marks omitted). Moreover, at least one court in the Fifth Circuit has ruled that there is no "rule" against group pleading. *See Gammon v. J.W. Steel and Supply, Inc.*, 2006 WL 2505631, *1 (S.D. Tex. 2006) ("There is no prohibition against group pleading. While group pleading is often disfavored in fraud claims, group pleading by itself does not require dismissal of a fraud claim.") (citations omitted).

> [A]t the time Plaintiff and the class members contracted with Defendants to obtain tax preparation services, Defendants represented that (a) they "maintain policies and procedures designed to restrict access to nonpublic personal information about you to those persons who need to know that information to fulfill your request for products or services" and that (b) "[t]hese policies and procedures include physical, electronic, and procedural safeguards that comply with federal regulations to guard your information." These representations were contained in, *inter alia*, Defendants' "Privacy Policy" issued to Plaintiff and the class members. These representations were false **_when made_**.

Docket No. 119, at ¶ 2 (emphasis in original); *see also* ¶¶ 24-27.

Defendants acknowledge they made the above-quoted representations, but contend the representations are meaningless. Defendants argue their representations are meaningless because they did not identify in their "Privacy Policy" the "specific policies and procedures" they allegedly had in place. *See* Docket No. 123-2, at p. 9. Defendants are wrong for 3 reasons.

**_First_**, Defendants' representations were specific. Defendants represented they had "physical, electronic, and procedural safeguards [in place] [to guard plaintiff's personally identifiable information] that compl[ied] with federal regulations[.]" Docket No. 119, at ¶ 24. Contrary to their representations, Defendants did *not* have such safeguards in place. *Id.* at ¶ 28.

**_Second_**, "[p]romises of confidentiality of information . . . are certainly more than incidental, *i.e.*, 'minor' matters." *Collegenet, Inc. v. XAP Corp.*, 442 F.Supp.2d 1070, 1077 (D. Or. 2006). This is particularly true here because the confidentiality representations "were made to fraudulently induce Plaintiff and the class members to obtain tax preparation services through Jackson Hewitt." Docket No. 119, at ¶ 26.

Defendants' ultimate goal was to lure customers based upon false statements regarding security protocols, all in an effort to increase their revenue. *See Collegenet*, 483 F.Supp.2d 1058, 1068 ("The only reasonable inference and conclusion to be drawn from this record is that [the defendant] used its privacy-policy statements to mislead students and to give them a false sense of security that their personal information would remain private. [The defendant] engaged in this deceptive practice for the sole purpose of increasing the number of 'yes' responses to the 'opt-in' question and, thereby, increasing [its] revenue.").

***Third***, several courts have recognized that a fraud claim can be based upon a defendant's "privacy policy." For example, in *Dunmire v. Morgan Stanley DW, Inc.*, 2005 WL 1005993 (W.D. Mo. 2005), the plaintiff alleged fraudulent inducement based upon the defendant's "privacy policy." The defendant filed a motion to dismiss, arguing the fraud claim must be dismissed as a matter of law because the claim could not be based upon defendant's "privacy policy." The court disagreed and reasoned as follows:

> Defendant argues any promises contained in its privacy policy related to its future actions, so they could not form the basis of a misrepresentation claim. However, if Defendant lacked the intent to fulfill the promises contained in its privacy policy when it promulgated that policy—thereby rendering the promises false at the very moment they were made—a fraud claim may be maintained. Plaintiff alleges the promises made in the privacy policy "were untrue, and are believed to have been untrue at the time made."

*Dunmire*, 2005 WL 1005993 at *3 (citations omitted). Noting "[t]he Court must accept the allegations as true," the court denied defendant's motion to dismiss plaintiff's fraud claim. *Id.*

As in *Dunmire*, plaintiff has properly asserted a fraud claim based upon Defendants' "Privacy Policy." *See* Docket No. 119, at ¶¶ 2 & 24-27. The Court should, therefore, deny Defendants' motions to dismiss. *See Dunmire*, 2005 WL 1005993 at *3; *see also Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 783 (7th Cir. 2004) ("Fleet's 'privacy policy' assures its consumers that Fleet 'shares the minimum amount of information necessary for that company [*i.e.*, the company with which it is sharing the information] to offer its product or service,' and this statement, which if false as alleged may well be fraudulent, might support a claim under state consumer protection or privacy law."). Plaintiff has alleged the "what" element.

### *3. When and Where Were the Fraudulent Representations Made? On January 31, 2006, at the Jackson Hewitt Office Located at 6601 Veterans Blvd., Metairie, LA*

Plaintiff has alleged the "when" and "where" elements. The false representations were contained in Defendants' "Privacy Policy," which was given to plaintiff on January 31, 2006, at the Jackson Hewitt office located at 6601 Veterans Blvd., Metairie, LA. *See* Docket No. 119, at ¶¶ 22-24.

### *4. How or Why Were the Representations Fraudulent? The Statements Were False When Made*

Plaintiff has also alleged the "how" or "why" element—a fact Defendants apparently do *not* contest. Throughout her amended complaint, plaintiff explains that Defendants' representations were fraudulent because the representations were false *when made*. *Id.* at ¶¶ 2-3 & 26-28. In other words, at the time Defendants made their representations, Defendants did *not* have physical, electronic, and procedural safeguards

9

in place to protect plaintiff's personally identifiable information per federal regulations. *Id.* Indeed, along with other laws identified under the "applicable law" section of plaintiff's amended complaint, Defendants were *not* in compliance with the Federal Trade Commission's Safeguards Rule. The Safeguards Rule states that a business ***must***:

> [D]evelop, implement, and maintain a comprehensive information security program that is written in one or more readily accessible parts and contains administrative, technical, and physical safeguards that are . . . reasonably designed to . . . (1) [i]nsure the security and confidentiality of customer information; (2) [p]rotect against any anticipated threats or hazards to the security or integrity of such information; and (3) [p]rotect against unauthorized access to or use of such information that could result in substantial harm or inconvenience to any customer.

16 C.F.R. § 314.3.

The Safeguards Rule also states, "[i]n order to develop, implement, and maintain [an] information security program," a business ***must***:

> (a) Designate an employee or employees to coordinate your information security program.
>
> (b) Identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that could result in the unauthorized disclosure, misuse, alteration, destruction or other compromise of such information, and assess the sufficiency of any safeguards in place to control these risks. At a minimum, such a risk assessment should include consideration of risks in each relevant area of your operations, including:
>     (1) Employee training and management;
>     (2) Information systems, including network and software design, as well as information processing, storage, transmission and disposal; and
>     (3) Detecting, preventing and responding to attacks, intrusions, or other systems failures.
>
> (c) Design and implement information safeguards to control the risks you identify through risk assessment, and regularly test or otherwise monitor the effectiveness of the safeguards' key controls, systems, and procedures.

> (d) Oversee service providers, by:
> > (1) Taking reasonable steps to select and retain service providers that are capable of maintaining appropriate safeguards for the customer information at issue; and
> > (2) Requiring your service providers by contract to implement and maintain such safeguards.
>
> (e) Evaluate and adjust your information security program in light of the results of the testing and monitoring required by paragraph (c) of this section; any material changes to your operations or business arrangements; or any other circumstances that you know or have reason to know may have a material impact on your information security program.

16 C.F.R. § 314.4.

Considering Defendants' failure to comply with federal regulations regarding personally identifiable information, [2] it is *not* surprising that the thousands of documents at issue were thrown away in a public dumpster.

### *C. Plaintiff Has Stated an Invasion of Privacy Claim*

Contrary to Defendants' argument, plaintiff has *not* attempted to "slip in an

---

[2] As alleged, at the time Defendants made their confidentiality representations, Defendants did *not*:

- Properly monitor their employees/agents to ensure necessary confidentiality and/or security protocols were followed.
- Properly discipline or reprimand for violations of confidentiality and/or security protocols.
- Properly store confidential customer information and documents in safe or secured locales.
- Properly monitor by alarm or otherwise their buildings, warehouses, and offices.
- Properly limit ingress and egress into company buildings, warehouses, and offices.
- Properly store confidential customer documents in locked or secured file cabinets or other secure locations.
- Properly maintain a chain-of-custody of confidential customer documents.
- Properly prohibit employees/agents from taking confidential customer documents home, or to other non-secure private and public places.
- Properly maintain a log of where confidential customer documents are located or maintained; and
- Properly dispose of confidential customer documents.

Docket No. 119, at ¶ 28.

amendment of her invasion of privacy claim[.]" Docket No. 123-2, at p. 10. As noted, plaintiff has *not* altered the theory of any of her claims, including her invasion of privacy claim.

### *1. JHTSI and JHI Are Liable for CCTSI's Unlawful Actions*

Although no discovery has taken place in this case, JHTSI and JHI seek dismissal based upon the contention they are not responsible for the alleged actions of Ms. Hall, who according to Defendants was CCTSI's "Director of Compliance" and in a "position of authority with access." Docket No. 119, at ¶ 36. JHTSI and JHI argue they cannot be held liable for the actions of Ms. Hall because she was an "employee of the independent franchisee CCTSI." Docket No. 123-2, at p. 11. In making their liability argument, JHTSI and JHI rely upon a copy of an exemplar and unsigned franchise agreement attached to plaintiff's complaint, which purportedly disavows any responsibility or liability for franchisee employees. *Id.*

In a similar vain effort, JHTSI and JHI argue they cannot be liable for Ms. Hall's alleged actions because Ms. Hall was acting outside the scope of her employment. *Id.* at p. 12, n. 11. Defendants' liability arguments should be disregarded for at least 2 reasons.

*First*, franchisors can and often are held liable for the unlawful actions of their franchisees. *See Vicarious Liability of Private Franchisor*, 81 A.L.R.3d 764, § 2(a) ("In a number of cases it has been held or recognized that a private franchisor may be liable for acts of his franchisee when the relationship between them is that of principal and agent or master and servant.") (gathering cases). Indeed, Louisiana courts, *including this Court*, have ruled that a franchisor may be held liable for the actions of its franchisee

12

based upon master-servant or agency principles. *See*, *e.g.*, *God's Glory & Grace, Inc. v. Quik Intern., Inc.*, 2005-1414 (La.App. 1st Cir. 6/9/06), 938 So.2d 730, 734 ("In considering the liability of the franchisor . . . to a third party . . . for the [actions of] . . . the franchisee, . . . we must look to the law on agency and mandate."); *Stewart-Sterling One, LLC v. Tricon Global Restaurants, Inc.*, 2001 WL 88207, *3 (E.D. La. 2001) ("[A]s a franchisor MFI could potentially be subject to imputation of liability from its dry cleaner franchisees under master-servant or agency principles.").[3]

***Second***, as this Court has ruled, "the existence and scope of a principal-agent relationship is a question of fact that is 'generally for the factfinder at trial to determine.'" *Industrial Maritime Carriers, Inc. v. Japan Heavy Lift*, 2006 WL 860979, *2 (E.D. La. 2006) (brackets omitted); *see also Wood v. Holiday Inns, Inc.*, 508 F.2d 167, 173 (5th Cir. 1975) ("The existence and scope of a principal-agent relationship is generally for the jury to determine[.]").[4] Similarly, whether an employee was acting in the course and scope of her employment at the time she committed a tort is generally a factual issue for the jury to decide. *See*, *e.g.*, *Boos v. BP Exploration & Oil Inc.*, 1995 WL 683866, *2 (E.D. La. 1995) ("[T]here remains a genuine question as to material facts on the issue of

---

[3] Although Defendants cite *Henry v. Taco Tio, Inc.*, 606 So.2d 1376 (La.App. 2d Cir. 1992), the case has nothing to do with franchisor liability for torts committed by the franchisee, or a franchisee employee, against a third party. The issue before the court in *Henry* was whether the franchisor was the plaintiff's "employer," or was otherwise responsible for the actions of the franchisee owner, who sexually harassed the plaintiff franchisee employee.

[4] *See also Northern v. McGraw-Edison Co.*, 542 F.2d 1336, 1343 (8th Cir. 1976) ("In assessing whether an individual occupies the status of an agent, it is necessary to review the facts and circumstances surrounding that individual's activities to determine whether the purported principal exerts the requisite control over the individual so as to create an agency relationship. Since this determination requires the finding and weighing of numerous facts, the ultimate resolution is appropriately left to the province of the jury in most instances.") (citation omitted).

whether Boos was in the course and scope of his employment."); *Billiot v. Terrebonne Parish Sheriff's Office*, 98-0246 (La.App. 1st Cir. 2/19/99), 735 So.2d 17, 23 ("Alliance concedes the question of whether or not Boudreaux was acting within the scope of his employment duties is a factual issue and was properly presented to the jury[.]").

With these rules in mind, Defendants' liability arguments are premature. Again, no discovery has taken place and so much is unknown. Plaintiff believes discovery will unveil the truth regarding many issues, including: the extent of control exercised by JHTSI and JHI over CCTSI; the identity of the person who actually threw the documents away;[5] and, whether that person was acting per Defendants' instructions and in the course and scope of her employment. For now, plaintiff has sustained her burden by pleading that JHTSI and JHI are vicariously liable for the wrongful actions that occurred. *See Stewart-Sterling One*, 2001 WL 88207 at *3 ("Regardless of whether [the plaintiff] ultimately can produce or prove such a set of facts, in the light most favorable to the plaintiff and with every doubt resolved in his behalf, he has stated a claim upon which relief could be granted. [The plaintiff] is entitled to offer evidence to support his claims[.]").

### *D. Plaintiff Has Stated an Unfair Trade Practices Claim*

As to plaintiff's unfair trade practices claim, Defendants make a "gumbo" argument composed of all previously asserted arguments as to why plaintiff's claims

---

[5] Based upon witness interviews, undersigned counsel suspects that Ms. Hall—the individual Defendants contend "stole" the documents and then threw them away—was actually *not* involved in the improper disposal of the documents. Undersigned counsel also suspects that Defendants know the true identity of the person or persons responsible for throwing the documents away.

14

should be dismissed. *See* Docket No. 123-2, at pp. 12-13. Defendants' "gumbo" argument is as unpalatable as Defendants' other arguments.

As explained above, and contrary to Defendants' argument, plaintiff has asserted her fraud claim with the specificity required by Fed. R. Civ. P. 9(b). Considering that plaintiff's unfair trade practices claim is based upon plaintiff's fraud claim, plaintiff's unfair trade practices claim is viable.

Plaintiff did *not* "improperly graft her invasion of privacy claim onto her LUTPA claim." *Id.* at p. 12. As explained above, plaintiff simply included in her unfair trade practices claim an allegation previously incorporated.[6] Plaintiff has stated an unfair trade practices claim.

### III. CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motions to dismiss. It is time for this case to move forward to the discovery phase.

---

[6] The allegation that Defendants invaded plaintiff's privacy was previously incorporated into plaintiff's unfair trade practices claim by the incorporation paragraph. *See* Docket No. 57, at ¶ 72 ("On behalf of herself only, Plaintiff hereby incorporates, as if written *in extenso*, ¶¶ 1 – 71 in support of this count.").

Respectfully Submitted,

/s/ Bryan C. Shartle
David Israel (LSBA No. 7174) (T.A.)
Bryan C. Shartle (LSBA No. 27640)
Justin H. Homes (LSBA No. 24460)
SESSIONS, FISHMAN, NATHAN & ISRAEL, L.L.P.
3850 N. Causeway Blvd.
Lakeway II, Suite 200
Metairie, Louisiana 70002
Telephone: (504) 828-3700
Facsimile: (504) 828-3737

Attorneys for Plaintiff,
Vicki L. Pinero

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the above and foregoing has been forwarded to all counsel of record ✓ by ECF; __ by email; __ by hand; __ by fax; __ by FedEx; __ by placing a copy of same in the U.S. Mail, postage prepaid this 18th day of May 2009.

<u>/s/ Bryan C. Shartle</u>
Bryan C. Shartle

N:\1-DI-Non-Collector-Misconduct\Pinero, Vicki-Class Action\Pleadings\LA Lawsuit\Motion to Dismiss\Opp. to Third Motion to Dismiss.05.18.09.doc